1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
   SCOTT HENNIGH, Cal. Bar No. 184413
3  ORI KATZ, Cal. Bar No. 209561
   MEREDITH JONES-McKEOWN, Cal. Bar No. 233301
4  4 Embarcadero Center, 17th Floor
   San Francisco, California 94111
5  Telephone:    415-434-9100
   Facsimile:    415-434-3947
6  Email:        shennigh@sheppardmullin.com
                 okatz@sheppardmullin.com
7                mjonesmckeown@sheppardmullin.com

8  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
9     Including Professional Corporations
   RICHARD W. BRUNETTE, Cal. Bar No. 81621
10 THERESA W. BANGERT, Cal. Bar No. 232803
   333 South Hope Street, 43rd Floor
11 Los Angeles, California 90071
   Telephone:    213-620-1780
12 Facsimile:    213-620-1398
   Email         rbrunette@sheppardmullin.com
13               tbangert@sheppardmullin.com

14 Attorneys for PICERNE CONSTRUCTION CORP.

15

16                 UNITED STATES BANKRUPTCY COURT

17                 CENTRAL DISTRICT OF CALIFORNIA

18                      LOS ANGELES DIVISION

19 In re:                              Case No. 2:09-bk-29222-ER

20 CAMPBELL CORNERS LIMITED            Chapter 11
   PARTNERSHIP I, a Michigan Limited
21 Partnership,                        **PICERNE CONSTRUCTION CORP.'S
                                       OBJECTION TO CONFIRMATION
22              Debtor.                OF CAMPBELL CORNER, L.P.'S
                                       FIRST AMENDED PLAN OF
23                                     REORGANIZATION (DATED MAY 7,
                                       2010)**
24
                                       Hearing Date:  July 14, 2010
25                                     Hearing Time:  10:00 a.m.
                                       Courtroom:  1568
26                                     Honorable Ernest T. Robles

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................ 2

A.    The Debtor's Assets ........................................................................ 2

B.    The Debtor's Liabilities ................................................................... 4

    1.    Whitehall Financial's Claim ................................................... 4

    2.    Picerne's claim ....................................................................... 4

    3.    The Contested Claims by Kopple's Revocable Trust ............ 4

C.    Treatment of Claims Under the Plan .............................................. 5

D.    Plan Funding ................................................................................... 6

III.    OBJECTION TO FIRST AMENDED PLAN OF REORGANIZATION ................. 6

A.    Plan Confirmation Standard ........................................................... 6

B.    The Plan Is Neither Fair Nor Equitable ......................................... 7

    1.    The Plan is not Fair and Equitable Because It Impermissibly
Pays Whitehall, the Impaired, Consenting Class, More Than
the Allowed Amount of its Claim ......................................... 8

    2.    The Plan is Not Fair and Equitable Because the Trust Retains
an Interest in the Reorganized Debtor, But the Debtor Has Not
Met its Burden to Prove the New Value Exception to the
Absolute Priority Rule ........................................................ 11

        a.    The Debtor Cannot Prove that the Trust's New Value
Contribution is Reasonably Equivalent to the Value or
Interest Received. ................................................... 11

        b.    The Debtor Has Not Met Its Burden Under 203 N.
LaSalle Because There Is No Opportunity To Submit
Competing Plans and The Equity Interests in the Debtor
Were Not Adequately Marketed For Sale. ............... 15

PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF
CAMPBELL CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.    The Plan is not Feasible Because the Debtor has not Established that the Debtor has Sufficient Cash Flow to Service the Secured Debt – 11 U.S.C. § 1129(a)(11) ................................................................. 17

D.    The Plan is Not in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7) ................................................................................. 19

IV.    CONCLUSION ....................................................................................... 19

1

2

## TABLE OF AUTHORITIES

3

Page(s)

4    Cases

5    Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach
        Venture, Ltd.)
6        166 B.R. 428, 436 (C.D.Cal. 1993).................................................................. 11

7
        Bank of America NT & SA v. 203 North LaSalle Street Partnership
8        526 U.S. 434 (1999) ........................................................... 13, 14, 15, 17

9    In re Beyond.com Corp.
10        289 B.R. 138, 145 (Bankr. N.D. Cal. 2003)................................................. 17

11    In re Bonner Mall Partnership
        2 F.3d 899, 906 (9th Cir. 1993)....................................................... 7, 11, 12
12

13    Case v. Los Angeles Lumber Products, Co., Ltd.
        308 U.S. 106, 121-22 (1939), reh'g denied, 308 U.S. 637 (1939) ........................ 11, 12
14

15    Computer Task Group, Inc. v. Brotby (In re Brotby)
        303 B.R. 177, 191 (9th Cir. B.A.P. 2003)...................................................... 18

16    In re Diversified Investors Fund XVII
17        91 BR 599, 561 (Bankr. C.D. Ca. 1988)....................................................... 19

18    Liberty Nat'l Ent. v. Ambanc La Mesa Ltd. Partnership (In re Ambanc Ltd.
        Partnership)
19        115 F.3d 650, 653 (9th Cir. 1997).......................................................... 6, 7, 11

20    Official Comm. of Unsecured Creditors v. Michelson
21        141 B.R. 715, 720 (Bankr. E.D. Cal. 1992).................................................. 17

22    In re Sagewood Manor Assocs. Ltd. P'ship
        223 B.R. 756, 763 (Bankr. D. Nev. 1998) ................................................... 18
23

24    In re Tucson Self-Storage, Inc.
        166 B.R. 892, 899 (9th Cir. B.A.P. 1994)..................................................... 11
25

26    In Re Victory Const. Co., Inc.
        42 B.R. 145, 155 (Bankr. C.D. Cal. 1984).................................................... 10

27

28

In re Weinstein
    227 B.R. 284, 293 (9th Cir. B.A.P. 1998)................................................9

In re Wiersma
    324 B.R. 92, 113 (B.A.P. 9th Cir. 2004), rev'd on other grounds, 483 F.3d 933
    (9th Cir. 2007) ...................................................................................18

Statutes

11 U.S.C.
    § 506(a)(1), (d) ..................................................................................8
    § 1111(b) ......................................................................................9, 10
    § 1129 ...............................................................................................6
    § 1129(a) ........................................................................................6, 7
    § 1129(a)(7) ..................................................................................7, 19
    § 1129(a)(8) .......................................................................................7
    § 1129(a)(11) ................................................................................7, 17
    § 1129(b) ...........................................................................................7
    11 U.S.C. § 1129(b)(1) ......................................................................7

§ 1129(b)(1) ...................................................................................7, 11
    § 1129(b)(2) .......................................................................................7
    § 1129(b)(2)(A) .................................................................................9
    § 1129(b)(2)(A)(i)(II) ........................................................................9
    § 1129(b)(2)(B)(ii) ...........................................................................17
    § 1129(b)(2)(B)(iv) ...........................................................................11

Bankruptcy Code §§ 506(a)(1) and 1111(b)...........................................8

§ 1111(b)(1)(a)(i)..................................................................................8
    § 1111(b)(2) ...................................................................................8, 9

Cal. Probate Code
    §§ 15401, 18200..............................................................................4

W02-WEST:1TLW1\402743200.2
Case No. 2:09-bk-29222-ER

**PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF CAMPBELL
CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION**

# I.    **INTRODUCTION**

Campbell Corners, L.P. (the "Debtor") has proposed a new value plan in which Robert Kopple ("Kopple"), through his revocable trust, will pay $4,675,000 to the estate in exchange for the equity interest in the Reorganized Debtor.[1]  On account of two contested claims asserted against the Debtor by Kopple's trust, Kopple will immediately receive $2,442,558 in cash under the Plan.  Thus, Kopple's true contribution to the estate is $2,232,442.  In exchange for $2,232,442, Kopple's Trust receives, among other things, (1) six parcels of real estate, with equity in the amount of $4,025,000 based on the Debtor's appraisals; (2) ownership of Castellino Villas, LLC, the Debtor's subsidiary, and (3) additional amounts recovered in any avoidance actions, including a fraudulent transfer claim that may bring as much as $5.9 million into the estate.

In order to obtain an impaired, consenting class, which allows the Debtor to use bankruptcy cramdown procedures, the Plan proposes to pay Whitehall Financial, which is an undersecured senior lender (Class 1) that has made the 1111(b) election <u>more</u> than it is entitled to under either Sections 506 and 1111(b).  Indeed, the Debtor proposes to pay Whitehall, the sole impaired, consenting creditor, a stream of payments of $5,310,458 on an allowed 1111(b) claim of $4,169,859, a <u>premium</u> <u>of</u> <u>over</u> <u>$1.2</u> <u>million</u> more than provided by Sections 506 and 1111(b).

Further, in violation of the U.S. Supreme Court's ruling in <u>203 N. LaSalle</u>, Kopple's trust has been provided with the exclusive opportunity to retain the equity interests in the Reorganized Debtor .  The Debtor has not terminated exclusivity, so competing plans may not be filed.  Further, the value of the retained interest has not been priced correctly because the Debtor's real estate broker marketed only the Debtor's real estate, not the equity interests being retained.  The offering memorandum sent out to prospective purchasers, while purporting to sell the "ownership interests" in the Debtor,

---

[1]     Undefined terms have the meaning set forth in the Debtor's First Amended Plan of Reorganization (dated May 7, 2010)(the "Plan").

1   expressly states that a winning bidder will <u>not</u> obtain the Debtor's equity interests, but only

2   the real estate.  In contrast, the value of the retained interest Plan clearly provides that

3   Kopple's trust will obtain these interests in exchange for his contribution.  Accordingly, the

4   value of the retained interest has not been tested and the Plan fails to meet the Supreme

5   Court's requirements under <u>203 N. LaSalle</u>.  Debtor has failed to carry its burden of proof

6   as to the absolute priority rule.

7          For the foregoing reasons and others set forth herein, the Debtor's Plan is

8   fatally flawed and cannot be confirmed.

9                    **II.    FACTUAL BACKGROUND**

10  **A.     The Debtor's Assets**

11         The Debtor owns six parcels of real property:  commercial retail space

12  known as Laguna Plaza and Laguna Pads (the "Laguna Properties"); the Toscana land

13  parcel; the Church land parcel; the San Servino land parcel; and two single family homes,

14  Harbor Shore and Agneta Court.  The Debtor represents that it has $4,025,000 in equity in

15  these properties based on its appraisals, all from the properties other than the Laguna

16  Properties, which should be abandoned to allow foreclosure given their admitted lack of

17  any equity.[2]  (Disclosure Statement, pp. 7-11.)

18         Absent from the schedules is a major asset that the Debtor hired Picerne to

19  build in September 2002, the 328-unit Siena Villas apartment complex ("Siena Villas").

20  On May 21, 2006, Picerne sent a demand letter to Debtor seeking damages of more than

21  $1,100,000.  Days later, the Debtor deeded Siena Villas to 9130 Nolan Street, a K.F. LLC

22  ("9130 Nolan").  The Debtor suggests an innocuous explanation for the transfer: the take-

23  out lender, Fannie Mae, required that a special purpose entity ("SPE") hold Siena Villas.

24  (Disclosure Statement, p. 11: 12-14.)  Given that SPE's indeed are common in real estate

---

[2]      The estate's retention of undersecured Laguna Properties must have a purpose.  The
Plan provides no explanation of why the Laguna Properties are being retained.  The
likely purposes are: (1) the avoidance of tax liability to the Debtor (i.e., debt
forgiveness income); and (2) avoidance of liability to the guarantor, both of which
have value to Kopple.

1   transactions, the transfer by the Debtor would not raise eyebrows were it not for one fact:

2   the Debtor received nothing in exchange for 328 apartments.  (Disclosure Statement, p. 11:

3   14-17.)  Kopple became the sole owner of 9130 Nolan, and thus, 328 apartments.

4        The Debtor has never explained what it received in exchange for this

5   transfer.  (See Disclosure Statement, pp. 11: 12-17; 28:18 to 31:4.)  If it had retained the

6   property, Picerne estimates that the estate would have an additional $5.9 million in equity.[3]

7   In addition, Debtor would have several years of net operating income (profits) from Siena

8   Villas.[4]  The Court appointed Peter Mastan as examiner (the "Examiner") to investigate,

9   among other things, a fraudulent transfer action to recover the Siena Villas apartment

10   complex for the benefit of the Debtor's creditors.  The Examiner's report is expected to be

11   filed in mid-September.

12        The Debtor is also the sole owner of Castellino Villas, LLC ("Castellino

13   Villas"), which owns the 120-unit Castellino Villas apartments that Picerne's appraisal

14   establishes as having as much as $2,400,000 in equity after payment of Picerne's

15   mechanics lien and the bank's deed of trust.[5]  The Plan does not acknowledge this asset of

16   the Debtor.  Additionally, the Debtor's schedules list as an asset a $3.5 million loan

17   receivable from Castellino Villas.  There is no meaningful mention of the treatment of that

18

---

19   [3]    Based on the Declaration of Richard Ribacchi, MAI, in Support of Further Briefing

20   Regarding Fraudulent Transfers, which was filed with the Court on April 9, 2010
(Docket #160)("Ribbachi Decl."), the Siena Villas property is worth $37,000,000 as

21   of April 5, 2010.  The Debtor has represented to this Court that the "third party
lender to Nolan Street, Fannie Mae, is currently owed approximately $31,800,000

22   and has a first trust deed against the Nolan Property securing that indebtedness".
(Debtor's Opposition to Motion for Authority to Prosecute Fraudulent and

23   Preferential Transfers in the Interests of the Estate (Docket #124), p. 4:22-24.)  This
leaves $5.9 million in equity in Siena Villas.

24   [4]    As of April 5, 2010, Siena Villas' net operating income is $2,621,247.  (Ribbachi
Decl. (Docket #160), Exh. A, p. 52.)  The Debtor's appraiser concluded that Siena

25   Villas' stabilized net operating income is $2,431,255.  (Declaration of Rob A.
Detling, MAI, in Support of Motion By Debtor to Value Real Property (Siena

26   Villas)(Docket #137), ¶ 20.)

    [5]    As this Court is aware, the value of the Castellino Villas apartments is still being

27   litigated in the Castellino Villas, LLC bankruptcy, Case No. 2:09-bk-29228-ER.
However, Picerne's appraisal concludes that the apartments are worth $16,990,000.

28

   **PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF CAMPBELL
CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION**

1   asset in the Disclosure Statement or Plan.  Yet Kopple is willing to invest millions of

2   dollars to obtain ownership of the equity interests in Castellino Villas, LLC, in that chapter

3   11 case.  Likewise, the Plan fails to disclose the Debtor's Wells Fargo bank account.

4   **B.      The Debtor's Liabilities**

5          1.      Whitehall Financial's Claim

6                  Whitehall Financial, LLC ("Whitehall") acquired the mortgage loan from

7   Central Pacific Bank to the Debtor, which is secured by a deed of trust on the Laguna

8   Plaza and Laguna Pads properties, which are valued at $3,940,000.  Whitehall's claim is

9   $4,169,859, which is more than the value of its collateral.

10         2.      Picerne's claim

11                 Picerne has an unsecured claim against the Debtor in the amount of

12  $3,116,537, based on a final judgment.

13         3.      The Contested Claims by Kopple's Revocable Trust

14                 The Debtor asserts that Kopple's revocable trust[6], EL II Properties Trust

15  ("Trust"), has two claims against it: a $4,969,919 claim based on loan advances allegedly

16  made to the Debtor prior to April 9, 2009, and a $1,235,147 claim for advances allegedly

17  made to the Debtor after April 9, 2009.  Just weeks after Picerne obtained an arbitration

18  award against the Debtor on March 16, 2008, Kopple executed two promissory notes

19  purporting to evidence these advances and recorded two deeds of trust on behalf of the

20  debtor in favor of his Trust, which purport to encumber all of the Debtor's assets.  When

21  questioned in the Rule 2004 examination regarding the backup documentation supporting

22  Kopple's Trust's alleged advances to the Debtor, Kopple testified that Debtor's January

23  2008 through April 2009 bank statements contain entries tracking the $4.9 million in

24  advances from Kopple's revocable trust to the Debtor.  (Bangert Decl., ¶ 3. Exh. B,

25  p. 109:11-21.)  A review of these bank statements do not show any transfers of money

---

[6]      A revocable trust is meaningless in terms of creditor rights, since it can be revoked
at any time and all assets revert to the trustor, i.e., Kopple.  Cal. Probate Code
§ § 15401, 18200.

1  from Kopple's Trust.  And as Picerne contends in its objection to the claim of Kopple's

2  Trust that, even if Kopple could show the transfer of funds from his Trust to the Debtor,

3  under circumstances where the Debtor was already facing huge creditor claims, the Trust's

4  claims must be characterized as equity, not debt.

5  **C.      Treatment of Claims Under the Plan**

6         The Plan categorizes the creditors into four classes.  Class 1 is Whitehall,

7  whose $4,169,859 claim will be paid more than in full as follows: an immediate cash

8  payment of $400,000 and the receipt of a promissory note of $3,700,000, due in five years

9  and accruing interest at 8%, with a monthly payment of $44,667, of which $20,000 will go

10  to principal.  The note will continue to be secured by a lien on the Laguna Plaza and Pads

11  properties.  Kopple will provide a new personal guarantee, his old one being extinguished.

12         Debtor asserts that Whitehall's collateral is worth only $3,940,000.  Thus,

13  despite Whitehall's undersecured status, Whitehall will retain its lien and receive full

14  payment of its $4,169,859 claim, plus 8% interest, under the Plan for a total of $5,310,458.

15  (Disclosure Statement, pp. 41-49.)

16         Class 2 consists of an alleged secured claim in the amount of $1,235,147 to

17  Kopple's revocable trust (i.e., the new value contributor).  Kopple's trust will be paid in full

18  under the plan.  That is, of the $4.675 million in new value being added by Kopple's Trust,

19  $1.2 million will be paid directly back to the Trust, allowing Kopple's Trust to acquire the

20  $4,025,000 million of equity for only $3,439,853, while retaining its unsecured claim in

21  the amount of $4,969,919 (discussed below).

22         Class 3 consists of all general unsecured creditors.  Picerne is a member of

23  this class with its claim in the amount of $3,116,935.  Kopple, through his Trust, is also a

24  member of this class with his claim in the amount of $4,969,919.  Although Kopple filed a

25  secured claim for this amount, his Trust knew the deed of trust was avoidable as a

26  preference and conceded it was by agreeing to be treated as an unsecured creditor for

27  purposes of the Plan.  (Disclosure Statement, p. 26: 15-25.)  Nonetheless, the contested

28

1  $4.9 million claim of Kopple's Trust substantially dilutes Picerne's recovery in Class 3.

2  The Plan proposes to pay Picerne and Kopple's revocable trust their pro rata share of

3  $2,012,353.  This means that Picerne would recover only 24.6% of its debt, while Kopple's

4  revocable trust recovers $1,207,411 of its contested, unsecured claim from itself.  Thus, in

5  total, under the Plan, Kopple's Trust receives six parcels of real estate, with equity in the

6  amount of $4,025,000 based on the Debtor's appraisals, in exchange for a net amount of

7  **$2,232,442**.

8          Class 4 consists of the equity interest, which will be terminated under the

9  plan.  However, Kopple's Trust, which is a limited partner of the Debtor, is issued new

10  equity interests in the Debtor as a result of the new value contribution.  Thus, after plan

11  confirmation, Kopple still owns and controls the reorganized Debtor and all its properties,

12  but has shed all other debts by paying only 24% of the claims.

13  **D.      Plan Funding**

14          The plan is primarily funded by the $4.675 million new value contribution

15  that will be made by Kopple's Trust.  This money will be immediately distributed pursuant

16  to the Plan.  (Plan, pp. 5:6 – 6:10.)  Future cash needs, such as paying monthly payments to

17  Whitehall, will come from (1) the estimated $50,800 recovery from the related Castellino

18  Villas bankruptcy some time in the future on account of the Debtor's unsecured claim

19  against the company; (2) future cash flow (which is minimal) from the operation of the

20  Debtor's properties; (3)  the proceeds of property sales; and (4) future contributions of

21  funds to the reorganized debtor from the Trust.  (Disclosure Statement, p. 55:9-20.)

22  **III.      OBJECTION TO FIRST AMENDED PLAN OF REORGANIZATION**

23  **A.      Plan Confirmation Standard**

24          The Bankruptcy Court has an affirmative duty to ensure that the Plan

25  satisfies all 11 U.S.C. § 1129 requirements for confirmation.  Liberty Nat'l Ent. v. Ambanc

26  La Mesa Ltd. Partnership (In re Ambanc Ltd. Partnership), 115 F.3d 650, 653 (9th Cir.

27  1997).  Section 1129(a) sets forth thirteen requirements to be met before the bankruptcy

28

**PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF CAMPBELL
CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION**

1  court may confirm a Plan. The bankruptcy court may confirm a Chapter 11 plan only if the

2  debtor proves by a preponderance of the evidence either (1) that the Plan satisfies all

3  thirteen requirements of 11 U.S.C. § 1129(a), or (2) if the only condition not satisfied is the

4  eighth requirement, 11 U.S.C. § 1129(a)(8), the Plan satisfies the "cramdown" alternative

5  to this condition found in 11 U.S.C. § 1129(b), which requires that the Plan does not

6  discriminate unfairly against and is fair and equitable towards each impaired class that has

7  not accepted the Plan.  Ambanc at 653.

8          The eighth requirement of Section 1129(a) provides that "with respect to

9  each class of claims or interests-(A) such class has accepted the plan; or (B) such class is

10  not impaired under the plan." 11 U.S.C. § 1129(a)(8).  Section 1129(a)(8) is not satisfied

11  because Class 3, of which Picerne is a member, voted against the Plan.  Because

12  Section 1129(a)(8) is not met, the Plan must satisfy the cramdown provision,

13  Section 1129(b), to be confirmed.

14          The two primary requirements for cramdown are that the plan (A) treat each

15  objecting impaired class fairly and equitably, and (B) not discriminate unfairly against any

16  objecting impaired class. 11 U.S.C. § 1129(b)(1).  Section 1129(b)(2) sets out specific

17  requirements for fair and equitable treatment.  11 U.S.C. § 1129(b)(2).

18          As shown below, the Plan does not treat Picerne fairly or equitably.  In

19  addition, the Plan cannot be confirmed as it is violates Sections 1129(a)(7) (i.e., feasibility)

20  and Section 1129(a)(11)(i.e., the best interests of creditors test).

21  **B.      The Plan Is Neither Fair Nor Equitable**

22          In order for a cramdown plan to be confirmable, it must not discriminate

23  unfairly and must be fair and equitable.  11 U.S.C. § 1129(b)(1); In re Bonner Mall

24  Partnership, 2 F.3d 899, 906 (9th Cir. 1993).

25

26

27

28

**PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF CAMPBELL
CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION**

1.      <u>The Plan is not Fair and Equitable Because It Impermissibly Pays Whitehall,
the Impaired, Consenting Class, More Than the Allowed Amount of its
Claim</u>

Debtor admits that Whitehall is an undersecured creditor.  However, Debtor intends to pay Whitehall more than it is entitled to receive under Sections 506(a)(1) and 1111(b) of the Bankruptcy Code.  The Plan proposes to: (1) pay Whitehall $400,000 immediately; (2) pay the remainder of Whitehall's claim with 8% interest through a stream of payments, plus a balloon payment in five years; and (3) allow Whitehall to retain its lien on the Laguna Pads and Laguna Plaza properties.  As explained below, Whitehall is receiving more than the Code permits on its unsecured claim, while other unsecured creditors are receiving only 24% of their claims.  Not coincidentally, Whitehall is the crucial impaired consenting class, thereby allowing the Debtor to use the cramdown procedures.

Under Section 506(a)(1), an undersecured creditor's debt is bifurcated into a secured claim in the amount of the value of the collateral, and an unsecured claim for the remainder.  11 U.S.C. § 506(a)(1), (d).  Here, Whitehall asserts a claim in the amount of $4,169,859.  Whitehall's debt is secured by a lien on the Laguna Pads and Laguna Plaza properties, which the Debtor has collectively valued at $3,940,000 (i.e., $1,040,000 + $2,900,000).  Using Debtor's numbers, Whitehall Financial is undersecured.  Thus, under Section 506(a)(1), Whitehall should have an allowed secured claim for $3,940,000 (the value of the collateral) and an unsecured claim for $229,859.

Alternatively, under Bankruptcy Code section 1111(b)(1)(a)(i), an undersecured creditor may elect that its entire claim be treated as fully secured in accordance with Section 1111(b)(2).   The Debtor states in its brief in support of plan confirmation that Whitehall indeed made such an election on its plan ballot.  (Confirmation Brief, p. 24:11-12.)  Regardless of the 1111(b) election, Whitehall's treatment under the Plan still exceeds what is permitted under the Code.

1    When an undersecured creditor makes an election under Bankruptcy Code

2  section 1111(b)(2), its claim is not altered by Sections 506(a) and (d).  In re Weinstein, 227

3  B.R. 284, 293 (9th Cir. B.A.P. 1998).  Rather, by making the election, the creditor gives up

4  its unsecured deficiency claim and, in exchange, its total claim is treated as an allowed

5  secured claim for purposes of the Chapter 11 plan confirmation process.  See 11 U.S.C.

6  § 1111(b); Weinstein, 227 B.R. at 293.  The creditor's allowed secured claim is equal to its

7  total claim rather than the value of the collateral.  Weinstein, 227 B.R. at 293.  In

8  exchange, certain repayment restrictions apply to the treatment of the electing creditor's

9  claim.  See 11 U.S.C. § 1129(b)(2)(A).

10    Section 1129(b)(2)(A)(i)(II) guarantees an electing creditor only a stream of

11  future payments equal to its claim.  Weinstein, 227 B.R. at 294.  Further, this stream of

12  future payments may only have a present value (using an appropriate discount factor)

13  equal to the value of the collateral.  11 U.S.C. § 1129(b)(2)(A)(i)(II); Weinstein, 227 B.R.

14  at 294.  For example, in the Weinstein case, the undersecured creditor was owed

15  $1,012,700 and the value of the collateral was $850,000.  Weinstein, 227 B.R. at 294.

16  Thus, "in order for the Bank to have its § 1111(b)(2) election properly applied, it must

17  retain a lien on the residential property for its total claim of $1,012,700.71 and must

18  receive a stream of payments with a present value of $850,000 aggregating

19  $1,012,700.71."  Id. (emphasis added).  In short, the electing creditor gets its entire claim

20  paid, but without interest during the repayment period.

21    Here, as an electing creditor, Whitehall may retain a lien for the full amount

22  of its claim under the Plan (i.e., $4,169,859), which it does.  Whitehall should then receive

23  a stream of payments with a present value of $3,940,000 (the Debtor's appraised value of

24  the Laguna Pads and Laguna Plaza properties), but which over time comes to a total of

25  only $4,169,859 (Whitehall's total claim).

26    Whitehall is treated better than Section 1111(b) allows.  Whitehall receives

27  under the Plan: (1) a $400,000 cash payment from the Reorganized Debtor; (2) a secured

28  note equal to "the outstanding indebtedness existing on the Effective Date, which is

-9-

1 estimated to be approximately $3.7 million after the $400,000 principal pay down;" and

2 (3) 8% interest on the note.  (Plan, pp. 13-14.)  The Plan provides that the Reorganized

3 Debtor will make payments to Whitehall in the amount of $44,667 per month, with

4 $20,000 of this amount being applied to principal.  (Plan, p. 15.)  The Plan further provides

5 that "[a]ll outstanding principal and interest…will be fully due and owing on the date

6 which is five years after the Effective Date."  (Plan, p. 15.)

7           Using these numbers, the Debtor will pay Whitehall $5,310,458, not

8 $4,169,859.  Debtor will make $2,680,020 in monthly payments over the course of five

9 years.  (Bangert Decl., Exh. A.)  At the end of that time period, there will be $2,230,438.38

10 then due and owing under the new promissory note that bears 8% interest, which under the

11 terms of Plan must be made as a balloon payment at the end of the five-year loan term.  Id.

12 This equates to a stream of payments of $4,910,458.38 ($2,680,020 + $2,230,438.38).

13 Including the $400,000 in cash paid on the Effective Date, the Debtor will make a total of

14 $5,310,458.38 in payments to Whitehall ($4,910,458.38 + $400,000).  Because Whitehall's

15 total allowed secured claim is only $4,169,859, this payment stream exceeds what

16 Whitehall may receive as an electing creditor under Section 1111(b) by over $1.1 million.

17           Whitehall consents to the Plan because it is receiving more under the Plan

18 than it is entitled to under either Sections 506(a)(1) or 1111(b).[7]  A plan is not fair and

19 equitable when Whitehall's unsecured claim is paid in full while other unsecured creditors

20 are paid only 24%.  In Re Victory Const. Co., Inc., 42 B.R. 145, 155 (Bankr. C.D. Cal.

21 1984)(stating that, " It is clear that the drafters intended the court to deny confirmation

22 where the plan proposes to pay more than 100 percent to a senior class without the consent

23 of a junior.")(citing Senate Report No. 989, 95th Cong., 2d Sess. 127-128 (1978)).

24 Accordingly, the Court should not confirm the Debtor's Plan.  Furthermore, the vote of a

25 creditor induced by payment of more than its allowed claim should not be counted as the

---

[7]      Why would a Debtor, which is a fiduciary to its creditors, pay Whitehall $1.1 million more than required?  Because of Kopple's guaranty, which is a separate obligation.

1    impaired consenting creditor necessary for a cramdown plan.  Without the vote of such a

2    creditor, the Debtor never reaches the cramdown phase.  11 U.S.C. § 1129(b)(1).

3        2.    <u>The Plan is Not Fair and Equitable Because the Trust Retains an Interest in</u>

4              <u>the Reorganized Debtor, But the Debtor Has Not Met its Burden to Prove the</u>

5              <u>New Value Exception to the Absolute Priority Rule.</u>

6            The absolute priority rule provides that a dissenting class of unsecured

7    creditors must be paid in full before any junior class can receive or retain any property

8    under a reorganization plan.  11 U.S.C. § 1129(b)(2)(B)(iv); <u>In re Tucson Self-Storage,</u>

9    <u>Inc.</u>, 166 B.R. 892, 899 (9th Cir. B.A.P. 1994).  For a plan to be "fair and equitable" under

10   the Bankruptcy Code, the absolute priority rule must be satisfied.  <u>In re Bonner Mall</u>

11   <u>Partnership</u>, 2 F.3d at 906; <u>In re Ambanc La Mesa Ltd. Partnership</u>, 115 F.3d 650, 654 (9th

12   Cir. 1997).  A bankruptcy court departing from this standard must articulate the unusual

13   and extraordinary reasons for doing so.  <u>Aetna Realty Investors, Inc. v. Monarch Beach</u>

14   <u>Venture, Ltd.</u> (<u>In re Monarch Beach Venture, Ltd.</u>), 166 B.R. 428, 436 (C.D.Cal. 1993).

15           The Ninth Circuit recognizes the new value exception to the absolute priority

16   rule, which allows the equity owners of a debtor in bankruptcy to obtain an interest in the

17   reorganized debtor in exchange for new capital contributions over the objections of a class

18   of creditors that have not received full payment on its claims.  <u>Bonner Mall Partnership</u>, 2

19   F.3d at 907-08, 915.  In essence, when evaluating whether a plan satisfies the requirements

20   of the new value exception, a court is deciding whether "old equityholders are unjustifiably

21   attempting to retain their ownership powers in violation of the absolute priority rule or

22   whether there is a genuine and fair exchange of new capital for an equity interest."

23   <u>Tucson</u>, 166 B.R. at 899.  "The burden is clearly on the proponent of the plan to satisfy all

24   the requirements of the new value exception."  <u>Id.</u>

25        a.    *The Debtor Cannot Prove that the Trust's New Value Contribution is*
               *Reasonably Equivalent to the Value or Interest Received.*

26           A proposed new value plan must meet all of the <u>Case v. Los Angeles</u>

27   <u>Lumber</u> requirements, which mean that the capital contributed must be:  (1) new;

28

1  (2) substantial; (3) money or money's equivalent; (4) necessary for a successful

2  reorganization; and (5) reasonably equivalent to the value or interest received.  Bonner

3  Mall Partnership, 2 F.3d at 906; see Case v. Los Angeles Lumber Products, Co., Ltd., 308

4  U.S. 106, 121-22 (1939), reh'g denied, 308 U.S. 637 (1939).  The Debtor has not, and

5  cannot, provide this Court with evidence that the proposed new value contribution from

6  Kopple's Trust is reasonably equivalent to the interest it is receiving under the Plan.

7          Kopple's Trust will be making a $4.675 million new value contribution, and

8  in exchange, will receive all of the equity interests in the Reorganized Debtor.  (Plan, pp.

9  3:15-25; 7:8-10.)  In order to determine whether the contribution of Kopple's Trust is

10  reasonably equivalent to the equity interests in the Reorganized Debtor, it is necessary to

11  know the value of those equity interests retained.  That is, "if an owner seeks to retain a

12  100 interest in the debtor, then she must contribute property reasonably equivalent to the

13  debtor's postconfirmation value."  7 Collier on Bankruptcy P 1129.03[4][c][i][B] (15th ed.

14  rev. 2010).

15          Here, the Debtor represents that the new value contribution is "reasonably

16  equivalent to the value being received" by Kopple's Trust (i.e., the equity interests in the

17  Reorganized Debtor) because a property auction will yield no buyers.  (See Confirmation

18  Brief, p. 29:15-19.)  The Debtor further states that the "amount of the New Value

19  Contribution was obtained from the detailed and comprehensive appraisals which were

20  prepared for each of the Debtor's Properties without any deduction for normal costs of

21  sale…."  (Confirmation Brief, p. 29:19-22.)  Thus, the Debtor seems to conclude that the

22  value of the equity interest in the Reorganized Debtor is equal to the aggregate value of the

23  real estate it owns.

24          The Debtor's argument ignores the value of other assets of the Debtor on the

25  valuation of the Reorganized Debtor.  First, the Debtor is the sole owner of Castellino

26  Villas.  Yet, the Debtors ascribe no value (zero or otherwise) to this asset.  Picerne's

27  appraisal in the Castellino Villas bankruptcy establishes that there is as much as

28

-12-

1  $2,400,000 in equity <u>after</u> payment of Picerne's mechanics lien and the secured lender's

2  deed of trust.

3          Second, the Debtor has claims against third parties that may generate funds

4  for the estate, such as avoidance actions and objections to claims.  The Examiner is

5  currently investigating the potential fraudulent transfer of Siena Villas to 9130 Nolan and

6  preference claims against Kopple's Trust, among other things, in order to determine their

7  value to the estate.  (See Docket #195).  Picerne believes that the fraudulent transfer claim

8  regarding to recover Siena Villas alone is worth more than $5.9 million to the Debtor

9  and/or its creditors, <u>plus</u> several years of profits from Siena Villas.  To the extent the value

10  of these claims exceed the unsecured claims in this case, this value will return to the

11  Reorganized Debtor.

12          Furthermore, the documents and testimony from the Debtor's 2004

13  examination suggest that Kopple's Trust cannot prove its $1.2 million secured claim and

14  $4.9 million unsecured claim against the estate because there is no evidence in the Debtor's

15  bank statements that Kopple's Trust actually advanced any money to the Debtor.  As it is

16  certain that the Debtor will not object to the claim of Kopple's Trust, Picerne will be filing

17  an objection.  Thus, at a minimum, a determination as to the value of the Reorganized

18  Debtor (and thus, whether the new value contribution is sufficient) cannot reasonably

19  occur until the Examiner's report valuing the avoidance claims is submitted to the Court

20  and Picerne's objection to the claim of Kopple's Trust has been resolved.

21          Third, the Debtor's conclusion as to the Debtor's value contains no

22  disclosures as to any tax or other personal benefit that Kopple or his Trust will receive by

23  the confirmation of a new value plan and retaining the equity interests in the Reorganized

24  Debtor.  An evaluation of whether sufficient new value is being contributed in a plan must

25  include an analysis of all value to the old equity holders, regardless of the property's

26  market value.  <u>See</u> <u>Bank of America NT & SA v. 203 North LaSalle Street Partnership</u>,

27  526 U.S. 434 (1999).  For example, the goal of old equityholders to avoid tax liabilities is

28  recognized as part of the equity's value.  <u>203 N. LaSalle</u>, 526 U.S. at 438.  The partners in

-13-

1   203 N. LaSalle paid <u>more</u> than the underlying assets were worth on the market because the

2   Debtor's partners wanted to avoid $20 million in personal tax liabilities if the bank

3   foreclosed on the debtor's property. <u>Id.</u> In addressing value unique to the old equity

4   holders, the Supreme Court held that:

> While it may be argued that the opportunity [to purchase the
> new equity interests] has no market value, being significant
> only to old equity holders owing to their potential tax liability,
> such an argument avails the Debtor nothing, for several
> reasons. It is to avoid just such arguments that the law is
> settled that any otherwise cognizable property interest must be
> treated as sufficiently valuable to be recognized under the
> Bankruptcy Code. [citation omitted] Even aside from that
> rule, the assumption that no one but the Debtor's partners might
> pay for such an opportunity would obviously support no
> inference that it is valueless, let alone that it should not be
> treated as property. And, finally, the source in the tax law of
> the opportunity's value to the partners implies in no way that it
> lacks value to others. It might, indeed, be valuable to another
> precisely as a way to keep the Debtor from implementing a
> plan that would avoid a chapter 7 liquidation.

14   <u>Id.</u> at 455. The Supreme Court observed that "[e]ven when old equity would pay its top

15   dollar and that figure was as high as anyone else would pay, the price might still be too

16   low <u>unless</u> the old equity holders paid more than anyone else would pay." <u>Id.</u> at 453, fn.

17   26 (emphasis added).

18         Under the Plan, the Debtor intends to retain the Laguna Properties and

19   restructure its debt to Whitehall. Given the lack of equity, these properties should be

20   abandoned to foreclosure. Presumably, the Debtor has retained them for a purpose. The

21   likely purposes are: (1) the avoidance of tax liability to the Debtor after Whitehall's

22   foreclosure (i.e., debt forgiveness income); and (2) avoidance of liability to the guarantor,

23   both of which have value. The Debtor fails to disclose or analyze these or other tax and

24   personal benefits to Kopple or his Trust by retaining the equity interests in the Debtor and

25   how that bears on whether reasonable value has been paid for the equity interests.

26         In short, in order for the Court to adequately determine whether reasonable

27   value is being exchanged, two values must be provided to the Court: (1) the amount of the

28   new value contribution; and (2) the value of what is being exchanged (i.e., the value of the

1   equity interests in the Reorganized Debtor to the old equity holder).  The Debtor failed to

2   provide the Court with an analysis of the value of the equity interests in the Reorganized

3   Debtor.  The Debtor argues in its confirmation brief that the value of the Trust's

4   contribution will be tested by the upcoming auction for the sale of the Debtor's properties.

5   (Confirmation Brief, p. 31;24-32:2.)  However, as discussed below, this marketing process

6   is flawed and will not be determinative of the value of the Reorganized Debtor.

7   Accordingly, the Debtor has not met its burden to establish the adequacy of the new value,

8   and thus, the Plan should not be confirmed.

9         b.    *The Debtor Has Not Met Its Burden Under 203 N. LaSalle Because*
               *There Is No Opportunity To Submit Competing Plans and The Equity*
10              *Interests in the Debtor Were Not Adequately Marketed For Sale.*

11          As acknowledged by the Debtor, the Plan cannot be confirmed unless it

12  meets the criteria imposed by the U.S. Supreme Court in 203 N. LaSalle, which require

13  that old equity pay full value to acquire or retain the property interest in the reorganized

14  debtor.  203 N. LaSalle, 526 U.S. at 454.  The primary test is whether the plan vests equity

15  in the reorganized business in a debtor's old equity holders "without extending an

16  opportunity to anyone else either to compete for that equity or to propose a competing

17  reorganization plan." Id. at 457.  New value plans that provide old equityholders with

18  "exclusive opportunities free from competition and without benefit of market valuation fall

19  within the prohibition of 1129(b)(2)(B)(ii)." Id. at 458.

20          Neither method for testing the value of a new value contribution set forth by

21  the U.S. Supreme Court in 230 N. LaSalle, has been successfully executed by the Debtor.

22  First, there has been no opportunity in this case to file competing plans.  On May 19, 2010,

23  the Court extended the Debtor's period of exclusivity to July 14, 2010.  On June 23, 2010,

24  the Debtor filed a motion to further extend the exclusivity period until such time as the

25  Court makes a final ruling on the Debtor's Plan (Docket #206).  This motion is scheduled

26  to be heard on July 14, 2010, the date of the Plan confirmation hearing.

27          Second, the Debtor has not adequately subjected the new value contribution

28  to the market because the Debtor marketed its real estate only, **not the equity interests in**

**PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF CAMPBELL
CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION**

**the Reorganized Debtor and the value of the entire estate**.  The Debtor hired William

Ayers of CB Richard Ellis ("CBRE"), a real estate broker, to "act as the Debtor's real estate

advisor and broker," to market the Debtor's six properties and conduct an auction at the

plan confirmation hearing on July 14, 2010.  (Declaration of William Ayers in support of

plan (Docket #209)("Ayers Decl."), ¶ 3.)  CBRE marketed the Debtor's real property

individually and as a portfolio.  (Ayers Decl., ¶ 5.)  CBRE prepared marketing brochures

for the properties, which included an "Offering Memorandum", and emailed them to

commercial real estate buyers, developers, investors and brokers contained in CBRE's

various real estate databases.  (Ayers Decl., ¶¶ 9, 10, Exh. 9.)  As the above information

suggests, the Debtor did not market the equity interests in the Reorganized Debtor and Mr.

Ayres declaration does establish that CBRE is competent to do so.

The Debtor attempts to show this Court that it marketed the equity interests,

as required under 203 N. LaSalle.  Indeed, Mr. Ayers declaration states that "Any party

that obtains the Debtor's total portfolio of Properties would therefore obtain the ownership

interests in the Debtor, and no other asset."  (Ayers Decl., ¶ 5.)  Further, the Offering

Memorandum sent to potential purchasers and attached to the Notice of Sale of Estate

Property filed on June 25, 2010 (Docket #210) expressly states that "Campbell Corners is

marketing and will be auctioning its Properties and/or 100% of its partnership interests (the

"Ownership Interests")."  (Ayers Decl., Exh. 9p. 3, ¶ 5.)

Despite the representations by the Debtor and Mr. Ayres that the equity

interests in the Reorganized Debtor were indeed marketed and offered for sale, paragraph 5

of the Offering Memorandum expressly states that "[a]ny purchaser which purchases

Campbell's Ownership Interests **will own the Properties and only the Properties**."

(Ayers Decl., Exh. p. 3, ¶ 5.)(emphasis added).  Thus, a successful overbidder at the

auction **cannot** obtain the equity interests in the Reorganized Debtor, even though this is

precisely what the Debtor is trying to value by allegedly subjecting it to the market.

Further, nothing in the Plan provides for the issuance of equity interests to the successful

bidder at the auction on July 14, 201.

**PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF CAMPBELL
CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION**

1  In <u>203 N. LaSalle</u>, the Supreme Court rejected the proposed new value plan

2  when the partnership retained exclusivity to file a plan and the partnership took "advantage

3  of this opportunity by proposing a plan under which the benefit of equity ownership may

4  be obtained by no one but the old equity partners." <u>203 N. LaSalle</u>, 526 U.S. at 454.

5  Similarly here, Kopple, through his Trust, has the exclusive opportunity to obtain the

6  equity interests in the Reorganized Debtor because no third party purchaser can obtain the

7  equity interests under the Plan.  Accordingly, this plan, like the plan in <u>203 N. LaSalle</u>, is

8  "doomed." <u>Id.</u> at 454.

9  In sum, as the Debtor neither terminated exclusivity nor subjected the

10  proposed new value contribution of Kopple's Trust to the market, the Debtor has not

11  satisfied the requirements under <u>230 N. LaSalle</u>.  Since equity interests in the Debtor are

12  being retained by former equityholders while unsecured creditors are not being paid in full,

13  the plan violates the absolute priority rule.  11 U.S.C. § 1129(b)(2)(B)(ii).  As a result, the

14  Plan is not fair and equitable, and not confirmable.

15  **C.**     **The Plan is not Feasible Because the Debtor has not Established that the
16          Debtor has Sufficient Cash Flow to Service the Secured Debt – 11 U.S.C.
17          § 1129(a)(11)**

18  As a condition to confirmation of a plan, the Bankruptcy Court must find that

19  "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for

20  further financial reorganization, of the debtor or any successor to the debtor under the plan,

21  unless such liquidation or reorganization is proposed in the plan."  11 U.S.C.

22  § 1129(a)(11).  This is often referred to as the feasibility requirement.  <u>See, e.g.</u>, <u>In re

23  Beyond.com Corp.</u>, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003) (citing <u>In re Acequia, Inc.</u>,

24  787 F.2d 1352, 1364 (9th Cir. 1986)).

25  The Bankruptcy Court must act "as a court of equity and . . . assure itself that

26  the plan is likely to succeed." <u>Official Comm. of Unsecured Creditors v. Michelson</u>, 141

27  B.R. 715, 720 (Bankr. E.D. Cal. 1992) (citing <u>U.S. v. Energy Res. Co.</u>, 495 U.S. 545, 549

28  (1990)).  It is the debtor's burden to prove that the plan has "a reasonable probability of

1    success."  Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 191 (9th Cir.

2    B.A.P. 2003).

3            Feasibility is established "through expert testimony 'and those

4    knowledgeable of the future prospects of the debtor.  The inquiry is on the viability of the

5    reorganized debtor, and its ability to meet its future obligations, both as provided for in the

6    plan and as may be incurred in operations.'"  In re Sagewood Manor Assocs. Ltd. P'ship,

7    223 B.R. 756, 763 (Bankr. D. Nev. 1998) (quoting 7 Collier on Bankruptcy ¶ 1129.03[11],

8    at 1129-65 (15th ed. 1984)).  Courts look at a number of factors in performing feasibility

9    analysis, including:

10              (1) the adequacy of the capital structure; (2) the earning power
                of the business; (3) economic conditions; (4) the ability of
11              management; (5) the probability of the continuation of the
                same management; and (6) any other related manner which
12              determines the prospects of a sufficiently successful operation
                to enable performance of the provisions of the plan.
13

14    Sagewood, 223 B.R. at 763 (quoting In re Lakeside Global II, LTD., 116 B.R. 499, 506

15    (Bankr. S.D. Tex. 1989)); see also In re Wiersma, 324 B.R. 92, 113 (B.A.P. 9th Cir. 2004)

16    (listing the same six factors as relevant when performing feasibility analysis), rev'd on

17    other grounds, 483 F.3d 933 (9th Cir. 2007).

18            The Plan is not feasible.  The Debtor clearly has inadequate cash flow to

19    service the Whitehall debt.  As the budgets attached to Debtor's motion for postpetition

20    financing filed on June 16, 2010 and the Debtor's monthly operating statements show, the

21    Debtor's assets generate very little income, certainly far less than the periodic payments

22    and eventual balloon payment required by the Plan.  Further, the Debtor has not submitted

23    a declaration from Kopple providing information relating to feasibility, such as his Trust's

24    willingness to provide the Reorganized Debtor with further loans as indicated in the Plan.

25    The Debtor simply has not met its burden to establish the feasibility of the Plan.

26

27

28

**D.    The Plan is Not in the Best Interests of Creditors – 11 U.S.C. § 1129(a)(7)**

The Plan necessarily fails the "best interests of creditors" test found in Bankruptcy Code section 1129(a)(7).  Under 1129(a)(7), the Debtor must be able to show that the creditors will do better under the plan than they would under a liquidation.  An accurate liquidation analysis is essential to enable creditors to compare their recovery under the plan with their recovery under a Chapter 7 liquidation.  In re Diversified Investors Fund XVII, 91 BR 599, 561 (Bankr. C.D. Ca. 1988).  The Debtor's Plan did not provide creditors with a liquidation analysis.  The Plan's failure to include a liquidation analysis renders the plan unconfirmable on its face.

## IV.    CONCLUSION

For the foregoing reasons, the Plan should not be confirmed.

DATED:  July 9, 2010

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By    _/s/ Theresa W. Bangert_
SCOTT HENNIGH
RICHARD W. BRUNETTE
THERESA W. BANGERT
Attorneys for Creditor
PICERNE CONSTRUCTION CORP. dba
CAMELBACK CONSTRUCTION

**F 4001-10.NA**

| In re        (SHORT TITLE)<br>CAMPBELL CORNERS LIMITED PARTNERSHIP I, a Michigan limited partnership<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NO.: 09-29222-ER |
| --- | --- |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **333 South Hope Street, 43rd Floor, Los Angeles, CA 90071-1422**

A true and correct copy of the foregoing document described:  **PICERNE CONSTRUCTION CORP.'S OBJECTION TO CONFIRMATION OF CAMPBELL CORNER, L.P.'S FIRST AMENDED PLAN OF REORGANIZATION (DATED MAY 7, 2010)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 9, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Todd M Arnold  *Attorney for Debtor*  tma@lnbrb.com
Ron Bender  *Attorney for Debtor*  rb@lnbrb.com
Mark Bradshaw  *Attorney for Central Pacific Bank*  mbradshaw@shbllp.com
Richard W Brunette  *Attorney for Picerne*  rbrunette@sheppardmullin.com
Ori Katz  okatz@sheppardmullin.com
Dare Law  *Attorney for U.S. Trustee (LA)*  dare.law@usdoj.gov
Peter J Mastan  pmastan@grlegal.com
Krikor J Meshefejian  *on behalf of Debtor Campbell Corners Limited Partnership I*  kjm@lnbrb.com
Leo D Plotkin  lplotkin@lsl-la.com, dsmall@lsl-la.com
Robert K Sahyan  rsahyan@sheppardmullin.com
Wayne R Terry  *Local Counsel for Whitehall Financial, LLC*  wterry@hemar-rousso.com
United States Trustee (LA)  ustpregion16.la.ecf@usdoj.gov

☐  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **July 9, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

| **Debtor**                                      *U.S. Mail* | **Creditor**                                   *U.S. Mail* |
| --- | --- |
| Campbell Corners Limited Partnership I<br>11340 Olympic Blvd., #210<br>Los Angeles, CA  90064 | Picerne Construction Corp.<br>1420 E. Missouri Ave., Suite 100<br>Phoenix, AZ  85014 |

F 4001-10.NA

| In re        (SHORT TITLE)<br>CAMPBELL CORNERS LIMITED PARTNERSHIP I, a Michigan limited partnership | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NO.:  09-29222-ER |

| | |
|---|---|
| **Judge's Copy**<br>Hon. Ernest T. Robles **(by Overnight Mail)**<br>U.S. Bankruptcy Court<br>255 E. Temple St., Suite 1560<br>Los Angeles, CA  90012 | |
| **VIA U.S. MAIL:** | |
| EL II Properties Trust<br>Robert Kopple, Trustee<br>11340 Olympic Blvd., #210<br>Los Angeles, CA  90064 | EL II Properties Trust<br>c/o Tom Lallas, Esquire<br>John P. Mertens, Esquire<br>Levy, Small & Lallas<br>815 Moraga Drive<br>Los Angeles, CA  90049 |
| Emery L Habiby<br>648 Kenneth Hahn Hall of Admin<br>500 West Temple St<br>Los Angeles, CA 90012-2713 | Ron Bender, Esquire<br>Krikor J. Meshefejian, Esquire<br>Levene, Neale, Bender, Rankin & Brill LLP<br>10250 Constellation Blvd Ste 1700<br>Los Angeles, CA 90067 |
| Scott Harris<br>Harris, Rosales & Harris<br>351 Saint Mary St<br>Pleasanton, CA 94566 | Peter J. Mastan<br>Gumport / Mastan<br>550 S Hope St Suite 825<br>Los Angeles, CA 90071-2627 |

☒  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 9, 2010 | Sharon L. Stevenson-Kelley | /s/ Sharon L. Stevenson-Kelley |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

**F 4001-10.NA**

| In re        (SHORT TITLE)<br>CAMPBELL CORNERS LIMITED PARTNERSHIP I, a Michigan limited partnership | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NO.:  09-29222-ER |

**SERVICE LIST (CONTINUED):**

SMUD
PO BOX 15830
MS A253
SACRAMENTO CA 95852-1830

Above Grounds Only
9241 El Grove Florin Rd
No. 219
Elk Grove, CA 95624

Bell, Rosenberg & Hughes LLP
1300 Clay Street
Ste 1000
Oakland, CA 94612

FPI Management, Inc.
800 Iron Point Road
Folsom, CA 95630

Los Angeles County Treasurer & Tax Collector
648 Kenneth Hahn Hall of Administration
500 West Temple St
Los Angeles, CA 90012

Miller Starr Regalia
Dept 05115
PO Box 39000
San Francisco, CA 94139

Laguna West Association
PO Box 348600
Sacramento, CA 95834

Terranomics
1650 Technology Drive, Suite 600
San Jose, CA 95110

Alliance Electric
PO 255524
Sacramento, CA 95865

Chips Pest Control
P.O. Box 7634
Citrus Heights, CA 95621

Whitehall Financial LLC
Richard Zussman / Thomas Coughlin
Iaffe, Raitt, Heuer & Weiss
27777 Franklin Rd., Ste. 2500
Southfield, MI 48034

Sacramento County
Assessor's Office
3701 Power Inn Rd. Suite 3000
Sacramento, CA 95826

Franchise Tax Board
Bankruptcy Section MS A340
PO Box 2952
Sacramento, CA 95812

Howard Rice Nemerovski Canady Falk & Rabin
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111

Sacramento County Tax Collector
Attn:  Bankruptcy
700 H Street, Room 1710
Sacramento, Ca 95814

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

Allied Waste Services
PO Box 78829
Phoenix, AZ 85062

Gallina LLP
201 North Civic Drive, Suite 230
Walnut Creek, CA 94596

Green Valley Landscape Services
8041 25th Avenue
Sacramento, CA 95820

Anita Landeros Reporting Inc.
PO Box 51826
Phoenix, AZ 85076-1826

Poop Patrol LH I
3120 Lewick Rd
Sacramento, CA 95821

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

**F 4001-10.NA**

| In re      (SHORT TITLE) | CHAPTER:  11 |
|---|---|
| CAMPBELL CORNERS LIMITED PARTNERSHIP I, a Michigan limited partnership | |
| Debtor(s). | CASE NO.:  09-29222-ER |

Robert C. Kopple
10866 Wilshire Blvd., Suite 1500
Los Angeles, CA 90024

Erich Kopple
9103 Laguna Main Street #170
Elk Grove, CA 95758

KF Properties, Inc.
11340 Olympic Blvd., #210
Los Angeles, CA 90064

Los Angeles County Treasurer & Tax Collector
P.O. Box 54110
Los Angeles, CA 90054-0110

Gallina LLP
201 North Civic Drive, Suite 230
Walnut Creek, CA 94596

Gallina LLP
1331 North California Blvd., #350
Walnut Creek, CA 94596-4564